UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SCOTT GREENWOOD,

Plaintiff,

-v- 9:23-CV-1413 (DNH/DJS)

SHERIFF JEFFERY T. SMITH; JAIL ADMINISTRATOR BARBUTI; SERGEANT CROSS; OFFICER MORRATTA; MELISSA BRAMER; GINA YESSE; PAULA HOFFMAN; OFFICER HILDRETH; LIEUTENANT BRAMER; CORPORAL KRESTSER; and MONTGOMERY COUNTY;

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
| --- | --- |
| LAW OFFICES OF MARIA DYSON<br>Attorneys for Plaintiff<br>418 Broadway, Suite 6180<br>Albany, New York 12208 | MARIA K. DYSON, ESQ. |
| MURPHY BURNS GROUDINE LLP<br>Attorneys for Defendants<br>407 Albany Shaker Road<br>Loudonville, New York 12211 | STEPHEN M. GROUDINE, ESQ.<br>THOMAS K. MURPHY, ESQ. |

DAVID N. HURD
United States District Judge

# DECISION and ORDER

## I. INTRODUCTION

This civil action arises from an incident that occurred at the Montgomery County Correctional Facility ("MCCF") in Fultonville, New York on July 12, 2023 when a pretrial detainee was assaulted by another inmate. On November 13, 2023, plaintiff Scott Greenwood ("Greenwood"), then acting *pro se*, filed this action pursuant to 42 U.S.C. § 1983 ("§ 1983") against defendants Montgomery County Sheriff Jeffery T. Smith ("Sheriff Smith"), MCCF Jail Administrator Barbuti ("Admin. Barbuti"), MCCF Sergeant Cross ("Sgt. Cross"), MCCF Corrections Officer Morratta ("Officer Morratta"), MCCF Medical Staff Melissa Bramer ("Nurse Bramer"), MCCF Medical Staff Gina Yesse ("LPN Yesse"), MCCF Medical Staff Paula Hoffman ("LPN Hoffman"), MCCF Corrections Officer Hildreth ("Officer Hildreth"), MCCF Lieutenant Bramer ("Lt. Bramer"), MCCF Corporal Krestser ("Cpl. Krestser"), and Montgomery County, New York (the "County") (collectively, the "defendants").[1] Dkt. No. 1. Plaintiff has since filed first and second amended complaints and obtained counsel in this matter. Dkt. Nos. 45, 50, 91. Thereafter, defendants filed an answer to Greenwood's second amended

---

[1] Although the case caption reflects defendant's name as "Corporal Krestser", the parties' briefing refers to him as either "Corporal Kretser" or "Corporal Kretzer." But for purposes of this motion, the Court will refer to the defendant as shown on the docket's case caption. Similarly, the parties' briefing at time refers to the defendant shown in the case caption to be LPN "Hoffman" as LPN "Hoffmann." This defendant will also be referred to herein as shown on the docket. The parties may submit any relevant corrections to the Court to correct the case caption.

complaint ("SAC"), and the parties proceeded to discovery, which has since concluded. Dkt. No. 53; Text Order, Dkt. No. 84.

Plaintiff's SAC asserts the following § 1983 claims against the defendants in their official and individual capacities: (1) Fourteenth Amendment failure-to-protect claims against defendants Sheriff Smith, Sgt. Cross, Admin. Barbuti, Officer Marrotta, Cpl. Krestser, Officer Hildreth, Lt. Bramer and the County; (2) a Fourteenth Amendment failure-to-intervene claim against Officer Marrotta; (3) Fourteenth Amendment medical indifference claims against defendants Nurse Bramer, Nurse Yesse, LPN Hoffman, Admin. Barbuti, Sgt. Cross, and Cpl. Krestser; and (4) a Fourteenth Amendment due process claim against Sgt. Cross for having been placed in restrictive confinement after the altercation. Dkt. No. 50.

On January 30, 2026, defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. Dkt. No. 102. Plaintiff has opposed. Dkt. No. 110. The motion has been fully briefed and will be considered on the basis of the submissions and without oral argument. Dkt. Nos. 102–103, 110–113, 116–17.

## II. **BACKGROUND**

The following section was developed from a review and comparison of the parties' respective Local Rule 56.1 statements along with the underlying records. *Compare* Defs.' Facts, Dkt. No. 102-33, *with* Pl.'s Facts, Dkt. No.112;

*see generally* Dkt. Nos. 102, 103, 110–12, 116–17.[2] Where factual disputes identified by plaintiff pertain to either the characterization of the defendants' statements or to the findings recorded in the materials cited, the following fact section is instead supported by direct citations to the relevant portion(s) of the record. In other cases, the record is cited directly for the purpose of either identifying or better describing certain relevant facts or issues that are in dispute.

On July 12, 2023, Greenwood was physically assaulted in a common area at MCCF by inmate Johnathan Gomez ("Gomez"). As a result of this assault, plaintiff suffered severe facial injuries, including an orbital blowout fracture, which required multiple surgeries. Pl.'s Opp'n, Dkt. No. 111 at 5; Pl.'s Aff., Dkt. No. 113 at ¶¶ 4–6.

**A. Events Leading Up to the Assault**

From January to September of 2023, plaintiff was incarcerated at MCCF. Pl.'s Facts ¶ 4. Upon being placed in MCCF, plaintiff was initially placed in a general population dormitory ("C-Pod"). *Id.* ¶ 5. Thereafter, plaintiff was subject to a disciplinary hearing for an incident unrelated to this action and ordered to spend fifteen days in "segregation." *Id.* ¶ 8. After

---

[2] Notably, and as addressed *infra*, however, plaintiff's responsive Statement of Material Facts only answered the first 26 assertions in defendants' Statement of Material Facts. *See* Dkt. No. 112. Accordingly, the remainder of the factual record is derived from a variety of plaintiff's other filings including his affidavits and memorandum of law. *See* Dkt. No. 110–11, 113, 117. And the fact that plaintiff did not file responses will be addressed in detail *infra*.

leaving segregation and as a result of being disciplined, plaintiff was relocated from C-Pod to a closed custody dorm ("B-Pod") designated for inmates with a demonstrated history of behavioral issues or violent acts. *Id.* ¶ 9; Cpl. Payne Dep., Dkt. No. 102-4 at 97:7–13.[3] On March 28, 2023, plaintiff was observed in B-Pod striking another inmate in the face when that inmate took his laundry bag and refused to return it. Greenwood Disciplinary Record, Dkt. No. 102-24 at 9; Greenwood Dep., Dkt. No. 102-2 at 38:2–39:17; Pl.'s Answers to Interrog., Dkt. No. 102-8 at 13. According to plaintiff, he acted in self-defense claiming the inmate he punched, along with Gomez and several other inmates, were trying to steal his laundry and fight him. Pl.'s Aff., Dkt. No. 113 at ¶ 8. Plaintiff asserts that during his disciplinary hearing, which was conducted by Cpl. Krestser, he expressed that his conduct was in self-defense because other inmates, including Gomez, had threatened him. Pl.'s Opp'n at 13. And after that incident, plaintiff claims Gomez made "numerous threats to hurt and kill" him and that "[d]efendants were well-aware" of Gomez's intention to attack plaintiff. *Id.* On April 5, 2023, plaintiff pleaded guilty to assault for the incident in B-Pod and was sentenced to fifteen days in segregation. Pl.'s Facts ¶ 12.

[3] Pagination corresponds to CM/ECF headers.

After completing his second stint in segregation, Greenwood returned to C-Pod. Pl.'s Facts ¶ 13. From his cell in C-Pod, Greenwood was able to see Gomez's cell in B-Pod through a window where he observed Gomez making threatening gestures towards him. *Id.* ¶¶ 14–15. At some point, however, Gomez made a nodding gesture to plaintiff and his threatening behavior stopped for a period of time. *Id.* ¶ 16; *see e.g.*, Greenwood Dep. at 55:17–24. But around May of 2023, plaintiff contends Gomez "threatened to kill him" while they were "in the recreation yard" and that a duty officer reported this to defendant Lt. Bramer who "responded and promised [Greenwood] that he would talk to Gomez." Pl.'s Aff. ¶ 9. Plaintiff has also testified that Gomez made multiple threats against him after the initial incident in B-Pod and repeatedly spoke with Sgt. Cross and other defendants in the months leading up to his assault. Pl.'s Aff., Dkt. No. 113 at ¶10.

In addition, plaintiff contends that, between March 2023 and July 2023, he "spoke with all of the named corrections officer defendants about Gomez's threats." *Id.* ¶ 10. While he was in C-Pod, plaintiff claims to have spoken "at length with each of the officers assigned to the housing unit" including Officer Hildreth, Officer Marrotta, Lt. Bramer, Sgt. Cross, and Cpl. Krestser. *Id.* ¶ 11. According to plaintiff, he discussed Gomez's threats the most with defendants Officer Marrotta, Officer Hildreth, Sgt. Cross, and Cpl. Krestser and, on several occasions, Sgt. Cross and Cpl. Krestser made fun of

him for being afraid of Gomez and asked whether he could "take Gomez in a fight." *Id.* ¶ 12. Plaintiff claims certain of these defendants said Gomez was "crazy" and had "unaddressed mental health issues. *Id.*

On June 19, 2023, Gomez was transferred from B-Pod to C-Pod, the dormitory in which plaintiff was placed. Gomez Supervision Classification, Dkt. No. 110-29. According to plaintiff, Gomez was moved "from his closed custody dorm to [plaintiff's] housing unit on C-Dorm on June 12, 2023" after being "charged and found guilty of assaulting another inmate in B-Dorm." Pl.'s Opp'n at 17. Despite being classified as a high-risk inmate warranting close supervision, *i.e.*, placement in B-Pod, non-defendant MCCF corrections officer Corporal Payne ("Cpl. Payne") testified that Gomez's transfer and classification into C-Pod, *i.e.*, general population, was the result of "an override" in MCCF's inmate placement system and/or procedures. *See id.*; Cpl. Payne Dep., Dkt. No. 102-4 at 80:5–84:3. This override was performed to avoid physical altercations in B-Pod because Gomez was "having problems" with two other inmates there. Cpl. Payne E-mail, Dkt. No. 110-38. Greenwood contends that he "immediately and repeatedly complained" to multiple correction officer defendants about Gomez's relocation. *Id.* at 18. Notably, plaintiff asserts that defendant Cpl. Krestser told him that "there was nothing they could do and nowhere else to put Gomez because he had keep-away orders." *Id.* Greenwood also testified to Cpl. Krestser telling him

that Gomez, while in his closed custody dorm, "wouldn't shut the fuck up about wanting to come to C-Dorm, and [...] promised he wouldn't cause any problems over here." Greenwood Dep. at 59:11–60–1. And at some point, plaintiff had a heated exchange about this with Cpl. Krestser about his concerns regarding Gomez where defendant yelled at him: "What the fuck do you want me to do? Do you want me to try and get you [protective custody]?" *Id*. at 60:4–22.

After Gomez's arrival in C-Pod, he spoke with plaintiff to apparently convey that the animosity between them from their time in B-Pod had subsided. Pl.'s Facts ¶ 18; Greenwood Dep. at 57:22–58:12. But plaintiff claims Gomez, knowing MCCF staff would not intervene or discipline him, nonetheless escalated his mistreatment of him and other inmates. Pl.'s Aff. ¶ 13. While defendants contend that, prior to July 12, 2023, there is no record at MCCF of any altercation, incident, disagreement, animosity, or "keep-away orders" between Greenwood and Gomez, plaintiff asserts the defendants "failed to document numerous incidents and threats of violence between the two in contravention of their duties and obligations[.]" Pl.'s Facts ¶ 20.

**B. The Altercation**

On July 12, 2023, plaintiff was watching a movie using a television in the C-Pod common area along with other inmates. Pl.'s Facts ¶ 21. Gomez

approached the group declaring he wanted to watch the news on the television. Pl.'s Facts ¶ 22. When another inmate objected, Gomez became irate and threatened to "knock [the other inmate] out." Greenwood Dep. at 73:1–18.[4] At this point, Gomez stood directly behind plaintiff. *Id*. at 73:19–20. At this time, Officer Morrata was on duty where he was tasked with supervising the C-Pod common area. *Id*. at 74:7–10. In response to Gomez's outburst, Officer Morrata yelled out Gomez's last name and Gomez walked away. *Id*. at 74:21–75:10.

But Gomez continued to rant about the television and threaten to knock someone out. *Id*. at 75:11–18. Minutes later, Gomez approached plaintiff again, at which point plaintiff tried to get Gomez to calm down and use a different television. *Id*. at 77:8–77:19. Gomez replied that he was going to "knock [Greenwood] out[.]" *Id*. at 78:2–7. This escalated such that plaintiff and Gomez stood face-to-face, with Gomez: (1) accusing plaintiff of being a snitch, (2) threatening to knock plaintiff out, and (3) asking Greenwood if he wanted to fight. *Id*. at 78:16–79:15. Officer Morrata observed this exchange but said nothing. *Id*. at 79:16–23. Greenwood then told Gomez they were going to continue to watch the movie and that Gomez said "okay," then plaintiff sat down believing Gomez had walked away to

[4] Defendants uploaded two copies of the same portion of Greenwood's transcript. Dkt. Nos. 102-1, 102-2. Neither version contains the entirety of that deposition, and in certain cases *infra* the Court cites to the complete version of the deposition uploaded by plaintiff. Dkt. No. 110-1.

continue watching the movie. *Id.* at 80:1–7. But contrary to plaintiff's impression, Gomez proceeded to hit plaintiff in the face from behind. Video footage of the incident shows that Gomez's assault on plaintiff lasted for approximately fifteen seconds. C-Block Video Recording, Dkt. No. 102-27. Prior to the attack, Gomez repeatedly walked around the area where plaintiff was sitting and at least one verbal exchange ensued between plaintiff and Gomez. *Id.* After this exchange, Gomez repeatedly walked back and forth between his cell and the area where plaintiff was sitting before ultimately striking plaintiff in the face from behind. *Id.* While plaintiff believed Gomez walked away prior to the assault, the footage makes clear Gomez remained in the vicinity until the time that he struck plaintiff. *Id.* Fifteen seconds into the assault, corrections officers arrived on the scene and separated the two, after which plaintiff was removed from the area and Gomez was placed into his cell. *Id.*

**C. Greenwood's Medical Care Following the Attack**

After plaintiff was removed from C-Pod, he was escorted by Sgt. Cross to MCCF's medical center where he was seen by Nurse Bramer. Greenwood Dep. at 104:22–105:19. Nurse Bramer photographed plaintiff's face, examined his injuries, and recommended he be taken to an outside facility for further treatment. *Id.* at 105:20–106:19. Nurse Bramer testified to taking Greenwood's vitals, providing him with an ice pack and a Tylenol, and calling

an MCCF Nurse Practitioner ("NP"). Defs.' Facts ¶ 45. According to Nurse Bramer, an NP instructed her to send plaintiff to the emergency room. *Id.* ¶ 48.

Plaintiff was then transported to the St. Mary's Medical Center emergency department within twenty minutes of the incident, where a CT scan was taken of his facial injuries before he was directed to Albany Medical Center ("AMC") to be seen by both an ENT specialist and an ophthalmologist and receive further treatment. Greenwood Dep. at 106:20–107:7; *see also* Defs.' Facts ¶ 51. The next morning, plaintiff was seen at AMC and received an ophthalmological evaluation and pain medication. *Id.* at 107:7–9; 109:4–6. Before being discharged, Greenwood was told he had "multiple fractures within [his] face" and "would need surgery[.]" *Id.* at 109:9–15. Plaintiff was advised that his facial swelling needed to go down before surgery could be performed, but that if there was too long of a wait before surgery it could not be completed. *Id.* at 109:16–19. Plaintiff was prescribed pain medication, told to take Tylenol and ibuprofen, and discharged. *Id.* at 110:3–14. But Greenwood testified he was never given the prescribed pain medication after returning to MCCF. *Id.* at 110:10–11. Plaintiff also contends that Nurse Bramer, Nurse Yesse, and LPN Hoffman failed to provide "medically necessary care" as ordered by his surgeon at AMC. Pl.'s Counter Statement of Material Facts, Dkt. No. 112-1 at ¶ 12. Specifically, Greenwood contends

he was not: (1) scheduled for surgery within 1-2 weeks of his initial visit; (2) given regular ice for his swelling; (3) provided pain medication; (4) given wound care; and (5) served a soft food diet. *Id.*

Plaintiff was placed into a segregated confinement area ("G-Pod") when he returned to MCCF. Greenwood Dep. at 110:18–21. Sgt. Cross informed plaintiff this placement was on the basis of "medical segregation." *Id.* at 110:22–111:8; Defs.' Facts ¶ 53; *see also* Sgt. Cross Aff., Dkt. No. 102-15 ¶¶ 26–27 ("I was informed that [plaintiff's] medical providers at the hospital expressed concerns about him being housed with other inmates. At the direction of the plaintiff's outside medical providers, I moved the plaintiff to G-Pod.") Sgt. Cross testified that when plaintiff returned, he e-mailed an NP to inform her that plaintiff would be placed in G-Pod, which was confirmed without objection. Defs.' Facts ¶¶ 54–55. Plaintiff testified that when he asked why he was medically segregated, Sgt. Cross told him his "injury was too extensive and it was too much a liability to put [him] in the general population" and "had to be segregated for [his] injury." Greenwood Dep. at 112:12–22. According to the defendants, "only a physician or [NP] can place [or remove] an inmate in long-term medical segregation[.]" Defs.' Facts ¶¶ 56–57.

According to defendants, when an inmate returns to MCCF following outside medical treatment, an NP or doctor reviews the inmate's medical

record and decides on a treatment plan, but neither "registered nurses or licensed professional nurses" could diagnose or make treatment plans. *Id.* ¶¶ 58–59. After being placed in G-Pod, Greenwood was visited three times each day by MCCF's medical staff as they passed out medication and had the opportunity to talk to staff about his pain. Greenwood Dep. at 115:2–5. On each visit, plaintiff would describe the nature of his pain. *Id.* at 115:7–9; Defs.' Facts ¶ 62. Plaintiff testified he was visited by defendants LPN Hoffman, Nurse Bramer, and Nurse Yesse. *Id.* at 115:13–16. While defendants assert the nurses brought Greenwood Tylenol, Ibuprofen, and muscle relaxers, plaintiff testified to, at times, being refused Tylenol and/or Ibuprofen. *Id.* at 115:21–116:8. When plaintiff told Nurse Bramer he needed "something more for pain than Tylenol and ibuprofen[,]" Nurse Bramer told him to submit a sick call slip to see the doctor. *Id.* at 116:14–22; Defs.' Facts ¶ 66. The nurses testified to not having the authority to prescribe or alter inmate prescriptions. Defs.' Facts ¶ 65.

On July 19, 2023, Greenwood returned to AMC for an ophthalmological evaluation where he was approved for surgery. Greenwood Dep. at 121:18–122:7; Defs.' Facts ¶ 68. On July 28, 2023, plaintiff had another follow-up appointment at AMC where he was told he "looked well" but needed to get "in for surgery as quickly as possible because" the deadline for surgery was approaching. *Id.* at 124:12–125:11. The doctor's assessment from that visit

indicates that plaintiff needed to have his surgery "next week before it is unable to repair." AMC Doctor's Note 7/28/23, Dkt. No. 110-6 at 2. On July 30, 2023, plaintiff submitted a sick call slip to MCCF's medical staff indicating that he had "been trying to tough it out" through his pain but needed "something" to help. Greenwood Dep. at 125:23–127:8. Greenwood testified that prior to submitting this slip, Nurse Bramer had told him to tough it out with his pain until his surgery and he sought to make a record of her approach to his treatment by submitting this slip. *Id.* at 126:20–127:8.

On August 10, 2023, plaintiff underwent surgery to repair his facial injuries. *Id.* at 133:2–5. Greenwood testified that the doctor who performed the surgery told him the procedure "took longer than usual[,]" that he "would be in a little more pain[,]" and that the pain would last "for a little bit longer because the surgery was late." *Id.* ¶ 133:6–15. Plaintiff further testified that the doctor said "under the circumstances he did the best he could with the surgery being late and that although the surgery "took twice as long given the circumstances" he "did the best that he could." *Id.* at 134:1–5. Four days after his surgery, plaintiff submitted another sick slip at MCCF to convey that medical staff "was trying to downplay" his condition. *Id.* at 134:20–135:13. Plaintiff also testified that, following the surgery, headaches he suffered following the altercation with Gomez became less frequent. *Id.* at 135:18–136:13.

Plaintiff testified that on August 13th and August 22nd, he visited with MCCF NP Angela Fraumane ("NP Fraumane"), who told him that "she couldn't control how [he] was treated for the month prior to the surgery and she couldn't change an anything that happened for that month but that she was going to make it a point that from that date forward [he would be given the treatment that I was supposed to be given from the day that I returned from the hospital." *Id*. at 136:14–137:4. While plaintiff testified NP Fraumane did not specify how he was not provided adequate treatment, he claims that he was told by a corrections officer that NP Fraumane "berated all of [the nurses] for the treatment that they gave [him] and for not relaying to them that [he] was on medical segregation [and] for not giving [him] an alternate pain medication." *Id*. at 137:5–13.

On August 22, 2023, plaintiff was moved from G-Pod back to C-Pod at the discretion of medical staff. *Id*. at 137:22–138:5; Defs. Facts ¶ 84. On August 30, 2023, plaintiff returned to AMC for an assessment of his surgical wounds where the surgeon found him to be stable. *Id*. at 140:4–11; Defs.' Facts ¶ 85. Thereafter, plaintiff remained on a course of Gabapentin prescribed by NP Flaumane that he testified was to address nerve pain on his face. *Id*. at 141:9–142:6.

While defendants did not address this claim in their briefing, Greenwood also claims that, following the assault, Gomez was inexplicably

moved into G-Dorm and placed in a cell directly across the hall from plaintiff. Dkt. No. 102-23 at 2, 5. Plaintiff contends defendants Admin. Barbuti, Sheriff Smith, and "other supervisory officials" knew Gomez was placed in G-Pod, and that an email went out directing the entire jail that plaintiff was to be locked in his cell whenever Gomez was outside of his cell. Pl.'s Opp'n at 25; Pl.'s Ex. 39, Dkt. No. 110-39. In plaintiff's view, this was a "gross violation of basic standards of human decency and dignity." *Id.* at 25. Plaintiff asserts that when he made complaints about his proximity to Gomez, Sgt. Cross, Lt. Bramer, and Cpl. Krestser called him "paper face," "mush face[,]" and "mashed potato face." *Id.* Similarly, he claims these same defendants, along with Officer Hildreth, asked plaintiff "how he liked looking at Gomez every day." *Id.* On September 14, 2023, plaintiff was transferred to a different correctional facility.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 56, summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th 674, 686 (2d Cir.

2023) (quoting *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017)).

A fact is "material" where it "might affect the outcome of the suit under the governing law." *Hilton v. Wright*, 928 F. Supp. 2d 530, 544 (N.D.N.Y. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In reviewing the motion, the district court must 'draw all reasonable inferences against the party whose motion is under consideration.'" *Lake v. HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 215 (N.D.N.Y. 2024) (quoting *Williams v. MTA Bus Co.*, 44 F.4th 115, 125 (2d Cir. 2022)). But "[a] question of material fact does not exist merely because plaintiff disagrees with the deposition testimony and documentary evidence produced by defendant[s]." *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 131 (E.D.N.Y. 2023) (citing *Anderson*, 477 U.S. at 247–48).

After a moving party carries its burden under Rule 56(c), its opponent then "must provide more than conclusory allegations … and show more than some metaphysical doubt as to the material facts." *See Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S De R L De C.V.*, 147 F.4th 73, 85 (2d Cir. 2025) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 20210)). Instead, "[t]he non-moving party 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.'" *Murrell v. Moscicki*, 790 F. Supp. 3d 213, 220 (W.D.N.Y. 2025) (quoting

*Brown v. Eli Lilly & Co.*, 654 F.4d 347, 358 (3d Cir. 2011)). "Indeed, 'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" *Campbell v. Belgard*, 765 F. Supp. 3d 234, 241 (W.D.N.Y. 2025) (quoting *Anderson*, 477 U.S. at 247–48).

"In sum, the ultimate test 'is whether the evidence can reasonably support a verdict in plaintiff's favor.'" *Waltman v. United Servs., Inc.*, 635 F. Supp. 3d 86, 98–99 (D. Conn. 2022) (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Waltman*, 635 F. Supp. 3d at 99 (quoting *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015)).

## IV. DISCUSSION

Plaintiff now brings the following § 1983 claims against the defendants in both their official and individual capacities: (1) Fourteenth Amendment failure-to-protect claims against defendants Sheriff Smith, Sgt. Cross, Admin. Barbuti, Officer Marrotta, Cpl. Krestser, Officer Hildreth, Lt. Bramer and the County; (2) a Fourteenth Amendment failure-to-intervene claim against Officer Marrotta; (3) Fourteenth Amendment medical indifference claims against defendants Nurse Bramer, Nurse Yesse, and LPN Hoffman, Admin.

Barbuti, Sgt. Cross, and Cpl. Krestser; and (4) a Fourteenth Amendment due process claim against Sgt. Cross for having been placed in restrictive confinement after the altercation. SAC, Dkt. No. 50.

Defendants now move for summary judgment. Dkt. No. 102. First, with respect to plaintiff's failure-to-protect claims, defendants argue that: (1) any statements plaintiff made about Gomez to Officer Marrotta, Cpl. Krestser, Sgt. Cross prior to being assaulted were insufficient, vague, and had become "stale" by the time of the attack; (2) Cpl. Krestser offer to place plaintiff into protective custody but plaintiff declined; (3) there is no showing that Lt. Bramer had any knowledge of animosity between Greenwood and Gomez; (4) plaintiff's claims that Officer Hildreth informed another inmate that plaintiff was a "snitch" and that this may have influenced Gomez's assault are baseless; (5) plaintiff's claims against Admin. Barbuti and Sheriff Smith were brought solely due to their status as policy-making officials and fail to show any personal involvement or individual action relevant to this matter; (6) plaintiff's *Monell* claim against the County, premised on inadequate training, fails because there is no underlying constitutional violations and plaintiff has only made conclusory statements that the County failed to implement training courses as to the screening of inmates and "failed to meet the minimum standards of New York State." Defs.' Mem. at 6–15.

Next, with respect to plaintiff's failure-to-intervene claim against Officer Morratta, defendants contend that: (1) "Officer Marrotta could not have been deliberately indifferent because he was not aware of a serious threat to the plaintiff until the assault occurred, and was unable to safely intervene after the assault arose"; (2) given the conduct of plaintiff and Gomez immediately before the assault took place, Officer Marrotta was "not on notice of a pending assault"; (3) "Officer Marrotta could not have intervened without jeopardizing the safety of himself and other inmates" and doing so was against MCCF policy; and (4) Officer Marrotta responded to the incident properly because, although he could not physically intervene, he still "made verbal orders for the inmates to stop and called for backup[.]" *Id.* at 16–19.

Third, defendants seek dismissal of plaintiff's due process claim against Sgt. Cross. Briefly stated, plaintiff claims his liberty interests were violated when, upon returning to MCCF after the assault altercation, he was placed into medical segregation/confinement in G-Pod by Sgt. Cross without notice and for punitive reasons. Defendants contend that: (1) Sgt. Cross did not have authority to dictate plaintiff's placement at MCCF; (2) plaintiff's medical providers directed his medical segregation; (3) Sgt. Cross emailed MCCF's NP upon plaintiff's return and received their approval to medically segregate him; and (4) the medical department at MCCF directs corrections

officers as to the withholding of privileges due to medical condition. *Id*. at 19–20. Defendants also point out that, ultimately, it was an MCCF NP who authorized plaintiff's return to general population from G-Pod once he was medically cleared. *Id*. at 21. In sum, defendants contend that plaintiff's due process claim against Sgt. Cross is misplaced because he only physically moved the plaintiff between cells without any greater authority to decide his placement. *Id*. at 22.

Finally, defendants seek dismissal of plaintiff's medical indifference claims against Nurse Bramer, Nurse Yesse, LPN Hoffman, Sgt. Cross, Lt. Bramer, Cpl. Krestser, and Admin. Barbuti. Broadly stated, plaintiff claims that defendants unnecessarily delayed scheduling his surgery and failed to treat him in accordance with his treatment plan. Defs.' Mem. at 22–28. He also claims that certain corrections officer defendants, to whom he complained about his medical care, were deliberately indifferent towards his grievances. *Id*.

But defendants assert that plaintiff never suffered any serious injuries because of his medical care and was not harmed by delays in scheduling his surgical operation. *Id*. at 23–25. And even if plaintiff were to demonstrate a delay causing serious harm, defendants argue Greenwood nonetheless fails to show that any of the named defendants were deliberately indifferent. *Id*. at 24–25. First, with respect to defendants Nurse Bramer, Nurse Yesse, and

LPN Hoffman, defendants argue that these nurses were not authorized to prescribe medicine, alter a prescription, or schedule surgery. *Id*. at 25. Defendants also argue that nurses and LPNs do not review paperwork from outside medical providers or determine treatment plans for inmates. *Id*.

With respect to plaintiff's medical indifference claims against corrections officers Sgt. Cross, Lt. Bramer, and Cpl. Krestser, defendants contend that they "must be dismissed due to a lack of personal involvement." *Id*. at 26. In support, defendants argue that: (1) plaintiff relies on "improper group pleading" which fails to show that each defendant engaged in unlawful conduct; (2) none of these defendants had any authority to review details of plaintiff's medical treatment; and (3) they were aware only that plaintiff "was receiving the proper [medical] treatment" and provided Greenwood with medical request slips to request alternative medical care. *Id*. at 26–28.

Finally, with respect to plaintiff's medical indifference claim against Admin. Barbuti, defendants argue that this claim is premised solely on supervisory liability and that plaintiff has not shown this defendant: (1) was personally involved; (2) every had any interactions or conversations; (3) was ever involved in his medical treatment; (4) knew about plaintiff's medical care or complaints. *Id*. at 28. Defendants also assert that the doctrine of qualified immunity applies to claims against the defendants in their individual capacity. *Id*. at 28–29.

**A. Threshold Matters**

Before turning to the merits highlighted *supra*, however, there are some housekeeping matters to be addressed.

1. Plaintiff's Responsive Statement of Material Facts

First, and as noted *supra*, the Court first notes that plaintiff's responsive Statement of Material Facts only addressed the first 26 factual assertions set forth in defendants' Statement of Material Facts. *See* Pl.'s Facts, Dkt. No. 112. But defendants' Statement of Material Facts included 89 factual assertions. While this was not addressed in subsequent briefing, our Local Rules make clear that:

> The opposing party shall file a separate Response to the Statement of Material Facts. The opposing party's response shall mirror the movant's Statement of Material Facts by admitting and/or denying *each* of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court *may* deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.

N.D.N.Y.L.R. 56.1(b) (emphasis added).

In light of plaintiff's incomplete filing, aside from defendants' first 26 factual assertions, the Court *may* deem admitted all remaining factual assertions (Defs.' Facts ¶¶ 27–89) if they are directly supported by the record. Nonetheless, the Court has considered plaintiff's opposition briefing, declarations, and responsive affidavit, along with the video footage of the

assault, to identify any evidence that tends to controvert the defendants' otherwise unrefuted assertions. Accordingly, the Court's analysis follows a thorough review of both the parties' respective statements of material facts and the broader record.

2. Plaintiff's Allegations Against Non-Defendants

Next, the Court notes that plaintiff's opposition briefing included various allegations that either appear to, or indeed do, refer to non-party officials at MCCF as defendants in this case. First, plaintiff appears to refer to non-party Cpl. Payne, who was deposed in this action, as a defendant in this matter. *See e.g.* Pl.'s Opp'n at 25, 30. But plaintiff is reminded that his request to add Cpl. Payne as a defendant was rejected and that he never subsequently filed a motion showing good cause to add that individual as a defendant. *See* Text Order, Dkt. No. 55. Accordingly, and given that this individual was not listed as a party in plaintiff's SAC, any allegations regarding Cpl. Payne will be disregarded for purposes of deciding *this* motion as they are not a party to this action.[5] *See* SAC, Dkt. No. 50.

And with respect to his medical indifference claims, plaintiff also refers to an MCCF Nurse Practitioner Santiago as a defendant. *See* Pl.'s Opp'n at

[5] The Court notes that several years after bringing this action, plaintiff filed another complaint against, *inter alia*, the defendants referenced in this subsection. Complaint, *Greenwood v. Santiago, et al.*, No. 26-555-CV (N.D.N.Y. Jan. 1, 2026), ECF. No. 1. Nonetheless, those parties are not defendants in *this* action.

34 ("On July 29, 2023, "Defendant Santiago directed that Mr. Greenwood's surgery needed to be scheduled […] but failed to ensure it was scheduled with the medically necessary repair window[.]; "[As of July 29, 2023] Defendant Santiago still had not evaluated Mr. Greenwood since his assault, not did she do so at any time before his surgery.") But given that Nurse Practitioner Santiago is not a defendant in this action and was not listed as a party in plaintiff's SAC, any claims against that individual will be disregarded. *See* SAC, Dkt. No. 50.

3. Official Capacity Claims

Finally, Greenwood brings claims against each defendant in both their individual and official capacities. But as this Court indicated in its previous decision and Order, Dkt. No. 6, "insofar as plaintiff asserts official capacity claims against the defendants, such claims are, in effect, claims against [the County]." *See* Decision & Order, Dkt. No. 6 (citing *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012)). Accordingly, plaintiff's official capacity claims against the defendants will be analyzed *infra* only as to the County, and the Court now turns to the merits.

**B. The Merits**

"[§] 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States."

*Little v. Cnty. of Nassau*, 708 F. Supp. 3d 252, 261 (E.D.N.Y. 2023) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999); § 1983. But § 1983 does not confer a federal right or benefit and instead "provides a mechanism for enforcing a right or benefit established elsewhere." *Little*, 708 F. Supp. 3d at 261 (quoting *Morris-Hayes v. Bd. of Educ.*, 423 F.3d 153, 159 (2d Cir. 2005)). "Accordingly, '[t]he factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary.'" *Id.* (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (cleaned up).

"To 'establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show … the defendant's personal involvement in the alleged constitutional deprivation.'" *Id.* (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)). In order to do this, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Tangreti*, 983 F.3d at 618); *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009).

1. <u>Greenwood's Failure-to-Protect Claims</u>

Plaintiff brings failure-to-protect claims in violation of the Fourteenth Amendment against defendants Sheriff Smith, Admin. Barbuti, Officer Marrotta, Corp. Krestser, Lt. Bramer, Officer Hildreth, Sgt. Cross, and the County. Defendant has moved for summary judgment as to each defendant.

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Little*, 708 F. Supp. 3d at 263 (E.D.N.Y. 2013) (quoting *Walker v. Schult*, 717 F.3d 119, 128 (2d Cir. 2013)); *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). But not all injuries suffered by inmates at the hands of other inmates give rise to constitutional liability on the party of the official responsible for an inmate's safety. *Farmer*, 511 U.S. at 834. Rather, the relevant inquiry focuses on whether an official has acted with "deliberate indifference to a substantial risk of serious harm to an inmate."

"A plaintiff must make two showings to prove a [deliberate indifference] claim under the Fourteenth Amendment, including when invoking a theory of failure to protect against (*i.e.*, prevent) an inmate attack." *Little*, 708 F. Supp. 3d at 263. First, plaintiff must satisfy an objective prong by "showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." *Id.* (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). The objective prong can be established where a plaintiff shows "that the conditions, either alone or in combination, posed an unreasonable risk of serious damage to his health." *Darnell*, 849 F.3d at 40. Stated differently, "the conditions must pose 'a substantial risk of serious harm.'" *Little*, 708 F. Supp. 3d at 263 (quoting *Lewis v. Siwicki*, 944 F.3d 427, 431 (2d Cir. 2019)) (applying the objective prong in the Eighth Amendment context); *see also Darnell*, 849 F.3d

at 30 (explaining that the objective prong is the same under either the Eight or Fourteenth Amendments).

But there is no "static test" to decide if a deprivation is sufficiently serious. *Id.* at 263. Rather, "the conditions themselves must be evaluated in light of contemporary standards of decency." *Id* (quoting *Darnell*, 849 F.3d at 30 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)); *see also Walker*, 717 F.3d at 125 (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)). With respect to failure to protect claims, "it does not matter ... whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 263–64 (quoting *Farmer*, 511 U.S. at 843)). Accordingly, "a plaintiff may satisfy the objective element by showing either a substantial risk of harm from 'a specific assailant' or 'a more general risk of harm due to the conditions at the time of the attack.'" *Id.* at 264 (quoting *Ataroua v. Tamir*, 2023 WL 2216139, at *3 (S.D.N.Y. Feb. 22, 2023) (cleaned up).

Second, the plaintiff must satisfy a subjective prong by "showing that the officer acted with at least deliberate indifference to the challenged conditions." *Little*, 708 F. Supp. 3d at 263. In order "[t]o establish the necessary subjective showing under the Fourteenth Amendment, *i.e.* show deliberate indifference, [p]laintiff must prove that a given [defendant] 'recklessly failed to act with reasonable care to mitigate the risk that the

condition posed to [plaintiff] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.'" *Id.* at 267 (quoting *Darnell*, 849 F.3d at 35). And while this is described as the subjective prong, "this determination 'is defined objectively' and 'can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.'" *Id.*

a. Sheriff Smith

First, Greenwood brings a failure-to-protect claim against Sheriff Smith that appears to be premised on his being placed in medical segregation after returning to MCCF from the hospital. Defendants contend this claim is based entirely on the defendant's status as a "policy-making individual[.]" Defs.' Mem. at 12–13. They also argue that this claim fails since § 1983 liability cannot arise solely from a defendant holding a position of high authority at MCCF and that plaintiff fails to show Sheriff Smith: (1) had any direct involvement; (2) ever interacted with Greenwood; and (3) ever had "any knowledge of any altercations, disagreements, or animosity between the plaintiff and [Gomez]" or "received any information or reports indicating that the plaintiff felt unsafe or threatened by [Gomez]." *Id.* at 13.

In opposition, Greenwood argues Sheriff Smith failed to implement polices or procedures to ensure adequate supervision of inmates with high-

risk and propensity towards violence. Pl.'s Opp'n at 42. Plaintiff claims when he was placed in medical segregation, Gomez was also moved there and placed directly across from Greenwood's cell. *Id.* at 25; *see also* Dkt. No. 102-23 at 2, 5. Plaintiff argues Smith was aware Gomez had been placed near Greenwood but failed to stand up to or object against "a gross violation of basic standards of human decency and dignity." *Id.* at 25. Plaintiff also contends that he was confined to his cell in the G-Dorm for five weeks of medical segregation. Pl.'s Opp'n at 28. Plaintiff asserts that, where inmates are determined to be "deprived of housing privileges or essential services[,]" such decisions should be reviewed every seven days by the facility's chief administrative officer or the highest-ranking facility official. *Id.* at 28. Plaintiff asserts that Sheriff Smith bore this duty and should have conducted at least four reviews of his medical confinement but failed to do so. *Id.*

But a plaintiff "can no longer succeed on a § 1983 claim against [a d]efendant by showing that as a supervisor he behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state of mind required for the constitutional deprivation he alleges." *Tangreti*, 983 F.3d at 618 (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010)) (cleaned up). "To establish a violation of § 1983 by a supervisor, as with everyone else, then, the plaintiff must establish a deliberate, intentional act on the part of

the defendant to violate the plaintiff's legal rights." *Id.* (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327–28 (10th Cir. 2020). Thus, "[t]he focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else." *Id.* (quoting *Porro*, 624 F.3d at 1328) (emphasis in original). Simply stated, there is no unique rule for ascertaining the liability of supervisors and they are viewed the same as anyone else. *Id.*

Upon review, plaintiff fails to show any deliberate, intentional action taken by Sheriff Smith that violated his constitutional rights. There is no evidence which establishes that Sheriff Smith was either obliged to periodically review his confinement status or, more importantly, that he neglected to do so. And plaintiff's assertion that defendant failed to implement polices to safeguard inmates is a bare conclusion lacking any evidentiary support. Accordingly, plaintiff's failure-to-protect claim against Sheriff Smith will be dismissed and defendant will be terminated from this action.

b. Admin. Barbuti

Next, plaintiff claims that he submitted a letter to Admin. Barbuti conveying Gomez's aggressive, "territorial" and threatening behavior before being assaulted, telling defendant that "there has to be a better place than

general population for people with mental health issues like [Gomez.]" Pl.'s Opp'n at 19; Pl.'s Aff., Dkt. No. 117. Plaintiff contends this letter was ignored. Defendants seek dismissal of this claim, arguing that plaintiff's contention that he sent a letter is insufficient to show defendant's personal involvement and that plaintiff has not presented any evidence, aside from self-serving testimony, to show that such a letter was ever sent. Defs.' Reply, Dkt. No. 116 at 6. Moreover, defendants point both to Barbuti's testimony that plaintiff never informed him that "he felt unsafe or threated by Gomez" and plaintiff's testimony that he never conveyed concerns about his personal safety or assault to defendant. *Id*; Barbuti Aff., Dkt. No. 102-9 at 6; Greenwood Dep. at 62:13–64:5.

Upon review, there are genuine issues of material fact remaining with respect to this claim. Namely, it is an open question as to whether plaintiff's letter was ever sent to Admin. Barbuti and/or whether it conveyed that Gomez posed a risk of substantial risk of harm to plaintiff or other inmates at MCCF. Resolving this question would also shed light on whether Admin. Barbuti deliberately or recklessly disregarded concerns about Gomez which carried excessive risk to plaintiff's health and/or safety. Accordingly, this claim survives summary judgment and defendants' motion requesting dismissal will be denied.

c. Officer Marrotta

Defendants next seek dismissal of plaintiff's failure-to-protect claim against Officer Marrotta, contending that any "vague and stale statements" Greenwood made to defendant prior to his attack are insufficient to establish defendant knew, or should have known, that Gomez posed an excessive risk. Defs.' Mem. at 7. In their view, plaintiff's claim that he told Officer Marrotta in April 2023 that Gomez had been making threatening gestures to him are "dubious and fragmentary[,]" and that plaintiff testified to joking with defendants about the gestures and how "dumb" and "ridiculous" Gomez was. *Id*. at 7–8. Further, defendants contend that enough time passed between plaintiff's April 2023 report and the July 2023 assault to render plaintiff's report claim "stale[.]" *Id*. at 8. In defendants' view, plaintiff "was the unfortunate victim of a surprise attack" that gives no support to a claim of deliberate indifference.

Plaintiff's failure to protect claim against Officer Marrotta also centers on the assault itself. At that time, Officer Marrotta was assigned to supervise C-Pod. Plaintiff argues that when Gomez was verbally threatening him directly before the assault, defendant was focused on his computer screen instead what was happening in the room. Pl.'s Opp'n at 9. Plaintiff contends that Gomez yelled at him for several minutes while pacing around the common area in a threatening manner. *Id*. During this time, plaintiff

contends that Officer Marrotta only looked up from his computer once and yelled "Gomez." *Id*. at 10. In his incident report, Officer Marrotta indicated observing Gomez and plaintiff arguing over the television and telling them both to stop. *Id*.

In plaintiff's view, Officer Marrotta, aware that Gomez had a propensity for violence, should have intervened when Gomez began threatening other inmates and causing a disturbance. Greenwood also contends that MCCF policy dictated ordering Gomez to either return to his cell or be separated from Greenwood. *See* Dkt. No. 110-10 MCCF Policy, Disciplinary Procedures, Pl.'s Ex. 10. And once Gomez began his violent attack on plaintiff, he contends Officer Marrotta never left his post at the officer's podium, and that defendant erroneously relies upon a policy to assert that he necessarily had to wait for backup to arrive. Pl.'s Opp'n at 11.

The Court finds that genuine issues of material fact remain as to whether plaintiff's statements to Officer Marrotta should have provided him with sufficient knowledge that Gomez posed an excessive risk to plaintiff. Further, there remains a genuine dispute of fact as to whether the circumstances leading up to Gomez striking Greenwood should have prompted Officer Marrotta to take swifter action than he did. The testimony that Gomez threatened to knock out plaintiff and other inmates raises a question as to whether there was a substantial risk of harm which was not

acted on until Gomez's initial violent act, *i.e.*, striking plaintiff, and whether the risk of violence should have been mitigated by calling corrections officers in sooner. The video footage of the incident makes clear that Officer Marrotta did not get up from the officer's podium before the assault occurred. Finally, it is unclear how much verbal intervention Officer Marrotta attempted in the moments leading up to the assault and whether it was reasonable under the circumstances. Accordingly, plaintiff's failure-to-protect claim against Officer Marrotta survives summary judgment.

d. Cpl. Krestser

Defendants contend that Cpl. Krestser was never aware of, nor had any reason to be aware of, any clear or specific threat of harm to plaintiff. Defs.' Mem. at 9. While Cpl. Krestser knew of an incident in B-Pod where plaintiff assaulted another inmate, defendant contends he was unaware of anything involving plaintiff and Gomez. *Id.* Further, Cpl. Krestser contends that, when he asked plaintiff if he would like to be entered into protective custody, Greenwood declined. *Id.* In sum, defendants contend that Cpl. Krestser was not deliberately indifferent because, prior to the assault on Greenwood, he offered to take protective action even in the fact of a vague report by plaintiff about what happened in B-Pod, and plaintiff declined his offer. *Id.* at 10.

Plaintiff contends that he had extensive discussions with Cpl. Krestser about Gomez. *See e.g.*, Pl.'s Opp'n at 16. He alleges that he repeatedly

reported Gomez's threatening behavior to defendant but that he neither documented nor took any action in response. *Id*. at 17. And as discussed above, Krestser responded angrily when plaintiff raised his concerns about Gomez being moved into C-Pod in light of those threats. *Supra*.

The Court finds that genuine issues of fact remain as to plaintiff's claims against this defendant. Notably, while defendant claims that he was only aware of plaintiff's incident in B-Pod, it is unclear what prompted his offer to place plaintiff into protective custody. Further, defendant's claim that he was unaware of any prior incidents between plaintiff and Gomez runs counter to plaintiff's claim that he raised issues with Gomez to Cpl. Krestser during his disciplinary hearing. Accordingly, plaintiff's failure-to-protect claim against Cpl. Krestser survives summary judgment and defendant's motion will be denied.

e. Sgt. Cross

Greenwood's failure to protect claim against defendant Sgt. Cross arises from his contention that, despite having told defendant he had had a prior incident with Gomez in B-Pod and that Gomez threatened him, Gomez was nonetheless permitted to return to C-Pod where he ultimately assaulted plaintiff. In plaintiff's view, his warning made clear to Sgt. Cross that Gomez posed a significant risk to his safety. Pl.'s Opp'n at 17. Moreover, Greenwood testified that Sgt. Cross was one of the people he spoke with most. *Id*. But

plaintiff claims that when he raised his concerns about Gomez to Sgt. Cross, defendant instead made fun of him for being scared of Gomez and asked him if he would be able to handle Gomez in a flight. *Id.*; Pl.'s Aff. at ¶ 12.

Defendants now seek dismissal of this claim, arguing that plaintiff's vague reference to a prior "issue in B-Pod" was not enough to show Sgt. Cross knew, or should have known, that Gomez posed an "excessive risk" of physical harm to plaintiff. Defs.' Mem. at 11. According to the defendants, Sgt. Cross was unaware of any prior altercation between Gomez and plaintiff, although he was aware of an incident where plaintiff assaulted another inmate. *Id.* And defendants argue that any animosity between Greenwood and Gomez had grown stale, particularly in light of plaintiff's own testimony that the two both played handball and engaged in small talk in the time period between the alleged incident in B-Pod and the time plaintiff was attacked. *Id.*

Upon review, the Court finds that plaintiff's failure-to-protect claim against Sgt. Cross survives summary judgment. There remains a genuine issue of material fact as to whether Sgt. Cross was, or should have been, reasonably aware that Gomez posed a substantial risk to the safety of the plaintiff or other inmates. While there was no prior physical altercation between Gomez and plaintiff before the incident at the heart of this matter, plaintiff has testified that he brought his concerns about Gomez's threatening

behavior to Sgt. Cross numerous times, and that Sgt. Cross went so far as to ask whether plaintiff could take on Gomez in a fight.

In this Court's view, this testimony creates a factual question as to whether an altercation involving plaintiff and Gomez was foreseeable to Sgt. Cross. And defendants have made no showing that Sgt. Cross acted in any way to mitigate, document, or otherwise respond to plaintiff's concerns. Nor have they set forth any reason why those concerns would have been baseless. In light of this, defendants' motion for summary judgment as to plaintiff's failure-to-protect claim against Sgt. Cross will be denied.

f. Lt. Bramer

As discussed *supra*, plaintiff claims Gomez "loudly threatened to kill him" in the recreation yard and that Lt. Bramer responded to this incident, advising Greenwood he would speak with Gomez. *Id.* at 17. Nonetheless, Gomez moved into C-Pod with Greenwood the following month. *Id.* Plaintiff contends he lodged further complaints to certain defendants, including Lt. Bramer, about Gomez's threatening behavior but was nonetheless assaulted by him three weeks later when he was moved into C-Pod.

Defendants contend that Lt. Bramer could not have acted with deliberate indifference because he was unaware of any issues between plaintiff and Gomez. Defs.' Mem, Dkt. No. 103 at 11. While Bramer may have spoken about problems between plaintiff and certain "Spanish guys,"

defendants contend that plaintiff admitted that Lt. Bramer did not identify Gomez as one of those people. *Id.*

The Court finds that there remain genuine issues of material facts as to whether Lt. Bramer was on notice of the threat posed to plaintiff by Gomez. At a minimum, defendants have not responded to the claim in plaintiff's affidavit that, prior to the assault, Gomez threatened to kill him in the recreation yard and that Lt. Bramer promised to talk to Gomez. Accordingly, there remain open questions of fact as to whether Gomez posed a substantial safety risk to both plaintiff or other inmates and whether Lt. Bramer's purported failure to respond to that incident constitutes deliberate indifference. Accordingly, defendants' motion for summary judgment as to plaintiff's failure-to-protect claim against Lt. Bramer will be denied.

g. Officer Hildreth

Similar to plaintiff's claims against other defendants, plaintiff testified that he spoke with Officer Hildreth "the most" about Gomez's threats against him prior the assault and that the defendant labeled Gomez "crazy" and stated Gomez had unaddressed mental issues. Pl.'s Aff. ¶ 12. Plaintiff also contends that Officer Hildreth "maliciously incited violence and animosity against him" and that he "was one of the corrections staff who treated him the worst." Pl.'s Opp'n at 14. Plaintiff's interrogatory responses assert that Officer Hildreth may have viewed Greenwood as a snitch because he met

with government officials and that he made that belief known to other inmates including Gomez. Pl.'s Interrog. Responses, Dkt. No. 102-8; Greenwood Dep. 171:12–17–12. This viewpoint appears to have arisen from Officer Hildreth escorting plaintiff to proffer sessions with the federal government while incarcerated at MCCF.

Upon review, the Court finds that, aside from plaintiff's claim that he heard another inmate say Officer Hildreth called him a snitch, he has not presented any evidence that this ever occurred. While such allegations may raise questions as to why Gomez later called plaintiff a snitch during the attack, it is not dispositive as to that question. And the affidavit from the inmate that plaintiff claims told him that Officer Hildreth called plaintiff a snitch makes no mention of this ever happening, instead offering a description of plaintiff's assault. *See* Meyer Aff., Dkt. No. 110-8.

Nonetheless, in light of plaintiff's testimony that Officer Hildreth was one of the defendants he spoke with most of all about Gomez's threats to him prior to the assault, it remains an open question whether defendant knew Gomez posed a substantial risk to plaintiff's safety or was even more broadly a danger to other inmates yet disregarded it. Accordingly, defendant's request to dismiss plaintiff's failure-to-protect claim against Officer Hildreth will be denied.

h. County

Finally, Greenwood brings a failure-to-protect claim under *Monell* against the County. Plaintiff contends that "unconstitutional acts and omissions were taken or ratified by the highest-ranking supervisory officials" where they permitted "high-risk inmates to remain in unsupervised general population" and sanctioned labeling and mocking conduct. Pl.'s Opp'n at 39. Greenwood argues that errors made with respect to MCCF's inmate classification system demonstrates deficiencies in the training provided to their corrections officers and directly led to the assault on plaintiff. *Id.* at 39–41. By showing that defendants overrode the classification system to allow Gomez back into C-Pod, plaintiff contends there is a genuine dispute of material fact as to whether defendants were properly trained. *Id.* at 41.

Defendants contend that plaintiff's claim against the County fails because he only offers conclusory statements that there was a failure to implement training courses related to inmate screening or meet state standards. Defs.' Mem. at 14. Further, they argue that Gomez's inmate file "did not contain any keep-away orders against the plaintiff or any documents referring to previous altercations, disagreements, or incidents between the plaintiff and [Gomez]." *Id.* at 15. Lastly, they argue that plaintiff has not identified any aspect of the County's inmate classification training which was deficient. Defs.' Reply, Dkt. No. 116 at 7.

"'The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right.'" *Smith v. City of Syracuse*, 2026 WL 775946, at *12 (N.D.N.Y. Mar. 19, 2026) (quoting *Chislett v. N.Y.C. Dep't of Educ.*, 157 F.4th 172, 184 (2d Cir. 2025) (cleaned up). "A municipality cannot be held liable on a theory of *respondeat superior*; the plaintiff must establish that the municipal custom *itself* was a 'moving force of the constitutional violation.'" *Id.* (quoting *Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)) (emphasis added). To establish that a policy, custom, or practice justifies municipal liability, "the plaintiff need not identify an express rule or regulation.'" *Id.* (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)." Rather, "[i]t suffices to establish that discriminatory practices were 'persistent and widespread' so as 'to constitute a custom or usage with the force of law' and that a discriminatory practice of subordinates was 'so manifest as to imply the constructive acquiescence of senior policymaking officials.'" *Id.* (quoting *Chislett*, 157 F.4th at 184); *Surlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992).

Upon review, and as defendants argue, plaintiff's conclusory allegations are inadequate for demonstrating municipal liability. Plaintiff's allegations of a deficient policy or custom with respect to MCCF's inmate classification system are entirely speculative and conclusory. Even taking plaintiff's claims

as true and finding that an error was made by MCCF staff which resulted in Gomez being placed in C-Pod, the notion that this error was the result of a deficient policy is not accompanied by any evidentiary support and there is nothing to suggest a "persistent and widespread" practices were at play as it pertains to plaintiff's claims. To the contrary, plaintiff only points to the discrete event of Gomez's classification being changed such that he was returned to C-Pod. While this event may have led to the assault, it does not meet the burden set forth *supra* that is required to make out a *Monell* claim. Accordingly, plaintiff's failure-to-protect claim against the County will be dismissed.

2. Failure-to-Intervene Claim against Officer Morratta

Next, Greenwood brings a § 1983 claim against Officer Morratta for failing to intervene when he was attacked by Gomez in C-Pod. Defendants seek dismissal of this claim, arguing Officer Morratta "could not have been deliberately indifferent because he was not aware of a serious threat to the plaintiff until the assault, and was unable to safely intervene until after the assault arose." Defs.' Mem, Dkt. No. 103 at 16. Defendants contend that when an argument began between Gomez and other inmates, including plaintiff, about the television in the common area, Officer Marrotta intervened by ordering for the inmates to stop. *Id.* at 16–17. At that point, defendants contend that Officer Morratta's order was complied with because

Gomez walked away and, as a result, "Officer Morratta was not on notice of a pending assault." *Id*. at 17. Finally, they contend "that Officer Morratta could not have intervened without jeopardizing the safety of himself and other inmates." *Id*.

Plaintiff has opposed. First, Greenwood argues Officer Marrotta was on notice of a prior history of incidents and threats between him and Gomez. Pl.'s Opp'n at 42. Next, plaintiffs contends that there is a factual dispute as to whether Officer Marrotta could have intervened without putting himself into physical jeopardy, and that the parties have presented conflicting testimonies regarding the events leading up to the assault. *Id*. at 42–43.

"Allowing an attack on an inmate to proceed without intervening in a constitutional violation in certain circumstances. *Rosen v. N.Y.C.*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) (quoting *Baker v. Tarascio*, 2009 WL 581608, at *4 (D.Conn. Mar. 6, 2009)); *Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986); *Morales v. N.Y.S. Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988). As relevant here, failing to intervene violates the Fourteenth Amendment "where the officer acted with 'deliberate indifference to a substantial risk of serious harm to an inmate.'" *Rosen*, 667 F. Supp. 2d at 359–60 (quoting *Farmer*, 511 U.S. at 828) (cleaned up). In this context, "[a]n officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate

without risk to himself, yet fails to intervene." *Id*. at 360 (quoting *Baker*, 2009 WL 581608, at *4; *Stubbs v. Dudley*, 849 F.2d 83, 86–87 (2d Cir. 1988)). As with plaintiff's other Fourteenth Amendment claims herein, he must satisfy both objective and subjective prongs to succeed on his claims. But in the context of this failure to intervene claim, plaintiff can succeed by showing:

> (1) that [the officer] observed or had reason to know that the Plaintiff was involved in a physical altercation with another inmate;
>
> (2) that [the officer] had a reasonable opportunity to intervene to prevent the attack from continuing. A reasonable opportunity to intervene means that the attack must have been of sufficient duration that an officer present at the scene would have had a reasonable opportunity to attempt to prevent the attack from continuing. However, in circumstances where a corrections officer reasonably concludes that further intervention would threaten the health and safety of all concerned, including correctional staff, his failure to intervene is not a constitutional violation;
>
> (3) that in failing to intervene [the officer was] deliberately indifferent to a substantial risk of harm to Plaintiff; and
>
> (4) that [the officer's] deliberate indifference to a substantial risk of harm was a risk that caused Plaintiff some harm. In order to show

sufficient harm to constitute a constitutional violation, Plaintiff need not prove that he suffered a serious physical injury, but only that he suffered some injury beyond a most minor one.

*Id.* (citing Williams *v. Russo,* 2009 WL 185758, at *4 (W.D.N.Y. Jan. 26, 2009).

Upon review, defendants' motion must be denied as to this claim. Having reviewed the video footage of the assault as well as the broader record, it is clear that Gomez spent several minutes walking around the area where plaintiff was seated prior to the assault. Dkt. No. 102-27. Given this, there are genuine fact questions as to whether Gomez repeatedly threatened to knock out, or otherwise physically assault, either plaintiff or other inmates and how much of that exchange was observed by Officer Marrotta. And taking plaintiff's claims as true, there is an open question as to why Officer Marrotta only called in other corrections officers once the assault on plaintiff was underway.

The Court finds defendants' argument unavailing that, because plaintiff testified to having been unaware Gomez was still standing behind him directly before the assault, it was "unreasonable" to expect Officer Marrotta to have been on notice of the impending assault. Aside from the fact that Officer Morratta, not plaintiff, was the individual surveilling and overseeing the common area in C-Pod, the video footage makes clear that

throughout the several minutes leading up to Gomez striking Greenwood, Officer Marrotta had a fuller view of Gomez than plaintiff at this point in time. For these reasons, the Court finds there remain open questions of fact as to why no similar intervention could have taken place prior to the assault, particularly in light of Gomez's conduct leading up to the incident and his alleged history of incidents at MCCF. Put differently, there is a genuine dispute as to whether Gomez's behavior in the moments leading up to the assault suggested that a substantial harm was impending and/or that Officer Marrotta, by waiting to act until the assault was underway, was deliberately indifferent to that risk. Accordingly, defendants' motion for summary for judgment will be denied as to plaintiff's failure to intervene claim against Officer Marrotta.

4. Due Process Claim against Sgt. Cross

Next, Greenwood brings a due process claims against Sgt. Cross, contending that following the assault, he was unlawfully confined in medical segregation and deprived of the rights he was entitled to before the assault. Pl.'s Opp'n at 43. Plaintiff claims he was entitled to placement in "the least restrictive housing consistent with his purported medical isolation" but was instead deprived of essential services and placed in proximity to Gomez where he was permitting to "taunt and threaten [p]laintiff on a daily basis. *Id*. at 42–43. Defendants have moved for summary judgment, arguing that

Sgt. Cross' role was merely to place plaintiff into medical segregation but that it was done at the direction of plaintiff's medical provider and that he received approval from an MCCF NP to do so. Plaintiff has testified that while he was in medical segregation, Gomez was placed next to him in G-Pod and he was taunted about his facial injuries by corrections officers, including Sgt. Cross. Moreover, plaintiff argues that because of his close proximity to Gomez in G-Pod, he was largely restricted to his cell and unable to move freely as he had been before the assault. Broadly stated, plaintiff argues that his placement in medical segregation was a punitive measure.

"[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). In determining "whether restrictions on pretrial detainees comport with substantive due process, '[a] court must decide whether the [restriction] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *Id.* (quoting *Bell*, 441 U.S. at 538). Without proof of intent to punish, "that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.'" *Id.* (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69

(1963) (alteration in original); *Block v. Rutherford*, 468 U.S. 576, 584 (1984). Thus, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id*. (quoting *Bell*, 441 U.S. at 539.)[3]

"[A] pretrial detainee's placement in a restrictive housing status like Administrative Segregation may be determined to be reasonably related to legitimate governmental purposes." *Id*. "[T]he government has a legitimate interest in the security of prisons, and […] prison officials should be afforded deference 'in the adoption and execution of policies and practices ... needed to preserve internal order and discipline and to maintain institutional security." *Id*. (quoting *Bell*, 441 U.S. at 547.)

Upon review, the Court finds that there remain unanswered questions as to whether plaintiff's conditions in medical segregation were for purely medical reasons or if there was also a punitive motive. Nonetheless, plaintiff has not shown that his medical segregation, based on a review of the record, was dictated by Sgt. Cross or anyone aside from plaintiff's medical providers and/or MCCF's medical staff. While it is unclear why Gomez was subsequently placed in G-Pod, let alone anywhere remotely near plaintiff, and thereafter permitted to taunt or threaten plaintiff following the assault,

plaintiff has not demonstrated that Sgt. Cross played any decision-making role in this confinement. Even if Sgt. Cross ridiculed plaintiff's medical condition, the record indicates that plaintiff was placed in medical segregation on the basis of his treatment plan and that Sgt. Cross obtained the approval of a NP upon escorting him to that confinement. Accordingly, defendants' request for summary judgment as to plaintiff's due process claim will be granted.

4. Medical Indifference Claims

Plaintiff brings medical indifference claims against defendants Nurse Bramer, Nurse Yesse, LPN Hoffman, Admin. Barbuti, Sgt. Cross, and Cpl. Krestser. Broadly stated, plaintiff contends that the defendants denied and/or delayed his access to a medical provider before his surgery and provided inadequate care that ran counter to the instructions of his physician's following his assault. Pl.'s Opp'n at 44–49. Plaintiff contends that he kept each defendant on routine, if not daily, notice of his "obvious pain, suffering, and the inadequacy of his treatment." *Id.* at 45. Finally, plaintiff contends because his surgery was not scheduled in a timely manner has recommended by the outside medical provider he saw following his assault, he suffered significant and permanent injuries.

Where a pretrial detainee brings claims of unconstitutional conditions of confinement, such claims are governed by the Due Process Clause of the

Fourteenth Amendment rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Darnell*, 849 F.3d at 29 (citing *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003)); *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). This is because, "[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'" *Id.* (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007)). Notably, a pretrial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (citing City *of Revere*, 463 U.S. at 244).

As with the failure-to-protect claims discussed *supra*, to establish a § 1983 claim for allegedly unconstitutional conditions of confinement a plaintiff must show that the officers acted with deliberate indifference to the challenged conditions. *Id.* (citing *Benjamin*, 343 F.3d at 50). A plaintiff bringing a medical indifference claim must satisfy an objective and subjective prong to prove their claim, with the objective prong requiring a showing that the conditions as it issue were "sufficiently serious to constitute objective deprivations of the right to due process" and the subjective prong requiring a showing that the "officer acted with at least deliberate indifference to the challenged conditions."[6] *Id.*

[6] In *Darnell*, the subjective prong is noted to be more aptly called the "mens rea prong" or mental element prong[.]" 849 F.3d at 29.

The contours of satisfying the objective standard have been largely described *supra* with regards to plaintiff's failure to protect claim. But as it pertains to this claim, "prisoners may not be deprived of their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future' health." *Id.* at 30 (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

Because the nature of the defendants' roles in plaintiff's post-assault care are quite distinct given their job duties at MCCF, plaintiff's medical indifference claims against the nursing staff and corrections staff will be analyzed separately.

a. Plaintiff's Claims Against Nursing Staff

Defendants seek dismissal of plaintiff's medical indifference claims against defendants Nurse Bramer, Nurse Yesse, and LPN Hoffman. They contend that these nurses had no authority to prescribe medication, alter a prescription, or schedule surgery. Defs.' Mem. at 25. Nor do they determine the appropriate course of treatment for a patient. *Id.* at 25–26.

But plaintiff contends that Nurse Bramer, Nurse Yesse, and LPN Hoffman "deliberately denied plaintiff with medically necessary care" as ordered by his surgeon at AMC. Specifically, he contends that plaintiff was not scheduled for surgery within 1-2 weeks of his initial visit, regular ice for

his swelling, pain medication, would care, and a soft food diet. Pl.'s Counter Statement of Facts, Dkt. No. 112-1 ¶ 12.

Upon review, the Court finds that there are several genuine disputes of material fact as to whether plaintiff was deliberately denied the care he was entitled to by these three defendants. As an initial matter, the Court agrees with the defendants that, based on the record, these defendants were not authorized to schedule surgeries or dictate/alter Greenwood's course of prescription medication. Accordingly, the Court cannot find that these defendants failed to prescribe any medicine he needed or had any impact on his receiving an untimely surgery. Any claim that the conduct of these defendants caused such harm, in this Court's view, that argument is misplaced here.

Nonetheless, there are issues of fact as to whether the execution of providing the medications, and communicating plaintiff's needs to an NP or doctor, was appropriate under the circumstances. Plaintiff has testified that his sick slips were not addressed and that he was, at times, instructed to "tough it out" when he was in pain. He has also testified that he was not always given the pain medication he was supposed to receive under his treatment plan. Finally, Greenwood has testified that NP Fraumane apologized to him for the quality of care he received. It is also an open fact question whether he indeed received that apology and why he received it.

While plaintiff's claims are not a model of clarity as to which of these nurses, if any, actually was deliberately indifferent to his medical needs, these questions are still vital to determining this claim and, accordingly, defendant's request for dismissal of this claim will be denied at this juncture.

b. Medical Indifference Claims Against Admin. Barbuti, Sgt. Cross, Lt. Bramer, and Cpl. Krestser

Following his assault, plaintiff claims and has testified that he wrote a letter to and tried to speak with Admin. Barbuti about his need for a surgical appointment but was ignored and no action was taken. Pl.'s Opp'n at 45; Pl.'s Aff., Dkt. No. 113 ¶ 118. Defendant has moved for summary judgment, arguing that Barbuti was not personally involved in his medical care, had no interactions with plaintiff, and is sued solely on his status as a policy-making official. Defs.' Mem, Dkt. No. 103 at 28.

Upon review, and much like with plaintiff's failure-to-protect claim against this Admin. Barbuti, there remain genuine issues of material fact that preclude summary judgment. Plaintiff has filed an affidavit claiming that he sent defendant a letter about his need for a surgical appointment. While defendant has asserted his lack of involvement in plaintiff's medical care, he has not asserted that he had no ability to be involved and has made clear he is a policy-making individual at MCCF. Nor has defendant explicitly denied receiving a letter from plaintiff. Given there are open questions of fact

as to whether the delay in surgery caused substantial harm to plaintiff, the possibility of ignoring a letter that may have better facilitated plaintiff's surgical appointment being scheduled, the court declines to rule in any way as to whether there was any deliberate indifference on the part of this defendant. Accordingly, defendants' motion for summary judgment will be denied as to Admin. Barbuti.

Defendants have also moved for summary judgment as to plaintiff's medical indifference claims against Sgt. Cross, Cpl. Krestser, and Lt. Bramer. Plaintiff's claims against these defendants are premised on verbally complaining to them on a daily basis about his pain and suffering following the assault once he was placed in medical segregation, and that they neglected to act to ensure he was treated in the manner prescribed by his medical providers. But plaintiff has not set forth any evidence that these defendants had any awareness of his treatment plan upon his return to MCCF from AMC. Nor has plaintiff shown with any specificity how any one of these defendants denied him medical treatment, and there is nothing to suggest these defendants were even authorized to provide him with medication. Plaintiff's affidavit only states that he was, on occasion, denied sick slips to submit to medical staff and that certain defendants would not accept his sick slips. But it is entirely unclear from a review of the record what defendant did this or on what basis. While plaintiff did mention in his

affidavit that Sgt. Cross ordered him to modify a grievance, he did not claim that this defendant ultimately denied or impeded his medical care. *See* Pl.'s Aff ¶ 19. Further, plaintiff has not presented any evidence showing his surgical appointment was delayed due to any inaction by these defendants. Given this, the Court fails to see how these three defendants deprived him of medical care or how their actions, or inaction, caused him to suffer any substantial medical injury. Accordingly, defendants' motion for summary judgment as to plaintiff's medical indifference claims against defendants Sgt. Cross, Lt. Bramer, and Cpt. Krestser will be granted, and those claims will be dismissed.

5. Qualified Immunity

Finally, insofar as plaintiff's failure-to-protect survive summary judgment, defendants argue that they are entitled to qualified immunity.

"Qualified immunity 'is an affirmative defense on which [Defendants have] the burden of proof.'" *McNamara v. Cnty. of Saratoga*, 748 F. Supp. 3d 68, 103 (N.D.N.Y. 2024) (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018)). On a motion for summary judgment, qualified immunity is determined "using a two-part inquiry that asks: "(1) 'whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a federal right' and (2) 'whether the right in question was clearly established at the time of the violation.'" *Id.* (quoting

*Sloley v. VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). The Court has discretion to decide which of these prongs to decide upon first. *Id.* at 103–104. (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). But under either prong, the Court cannot "resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656.

Indeed, there remain genuine questions of fact as to whether the defendants violated plaintiff's constitutional rights in this case. Namely, there are genuine disputes of fact as to whether the surviving defendants failed to protect plaintiff prior to the assault by allowing him to be in Gomez's proximity given plaintiff's testimony that he had written letters and made verbal reports as to Gomez's threats, whether Officer Marrotta failed to intervene directly before and during plaintiff's assault, and whether Sgt. Cross violated his due process rights by placing him in segregated confinement with reduced privileges and in proximity to Gomez. Accordingly, defendants' arguments that they are entitled to qualified immunity will be rejected at this juncture.

## V. CONCLUSION

For the foregoing reasons, plaintiff's Fourteenth Amendment failure-to-protect claims survive for trial as to defendants Admin. Barbuti, Sgt. Cross, Officer Marrotta, Cpl. Krestser, Officer Hildreth, and Lt. Bramer but are

dismissed as to defendants Sheriff Smith and the County. Further, plaintiff's Fourteenth Amendment failure-to-intervene claim against Officer Marrotta survives for trial. Next, plaintiff's Fourteenth Amendment due process claim against Sgt. Cross for having been placed in restrictive confinement after his assault will be dismissed. Finally, plaintiff's Fourteenth Amendment medical indifference claims survive for trial as to defendants Nurse Bramer, Nurse Yesse, LPN Hoffman, and Admin. Barbuti but will be dismissed with respect to defendants Sgt. Cross, Lt. Bramer, and Cpl. Krestser.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment (Dkt. No. 102) is GRANTED in part and DENIED in part;

2. Plaintiff's failure-to-protect claims against Sheriff Smith and the County are DISMISSED;

3. Defendants Sheriff Smith and the County are terminated from this action;

4. Defendants' motion for summary judgment as to plaintiff's failure-to-protect claims against Admin. Barbuti, Sgt. Cross, Cpl. Krestser, Lt. Bramer, and Officer Hildreth is DENIED;

5. Defendants' motion for summary judgment as to plaintiff's failure-to-intervene claim against Officer Morratta is DENIED;

6. Plaintiff's Fourteenth Amendment due process claim against Sgt. Cross for unlawful confinement is DISMISSED;

7. Plaintiff's medical indifference claims against Sgt. Cross, Cpl. Krestser, and Lt. Bramer are DISMISSED;

8. Defendants' motion for summary judgment as to plaintiff's medical indifference claims against Admin. Barbuti, Nurse Bramer, Nurse Yesse, and LPN Hoffman is DENIED;

9. Defendants' request for qualified immunity is DENIED as premature; and

10. The parties shall file a joint status report in THIRTY DAYS from the date of this opinion advising the Court of (1) trial readiness as to all surviving claims and (2) whether a settlement conference before the magistrate judge might be fruitful.

The Clerk of the Court is directed to terminate the pending motion (Dkt. No. 102), terminate Sheriff Smith and the County from this action, and set deadlines accordingly.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated: September 30, 2026
Utica, New York.